## North Chicago St. R. R. Co. v. Mary Smadraff.

89   411
a189s 155

1. Excessive Damages—*When $5,000 is Not Excessive.*—A married woman was injured in a collision with a street car. She was pregnant at the time, and in about six weeks afterward gave birth to twins. She testified that they were born seven months from conception; that

from the time of the accident to their birth she was sick and suffered pain; had hemorrhages from the womb, and could not rest; that it was four months before she could get out of child-bed. Before the accident she was healthy and strong, could do her own work and that of others, earning $1.50 per day; that since the accident she has been unable to work, and has had constant pain in her side and shoulders. One of the twins lived two years and the other about two weeks longer. It was held that a judgment for $5,000 was not excessive.

**Action on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. Samuel C. Stough, Judge, presiding. Heard in this court at the October term, 1899. Affirmed. Opinion filed June 14, 1900.

John A. Rose and Louis Boisot, Jr., attorneys for appellant.

Walsh & McArdle, attorneys for appellee.

Mr. Justice Adams delivered the opinion of the court.

Appellee in a suit against appellant for an injury to her person obtained a verdict for the sum of $7,544. The court required, as a condition of refusal to grant a new trial, that appellee should remit $2,544 from the verdict, which was done, and judgment was entered for $5,000, from which this appeal was taken.

The accident occurred on Dearborn street, a short distance north of Monroe street, in the city of Chicago. The former street lies north and south, and the latter east and west. There are car tracks of appellant in both streets. The track on Monroe street comes into Dearborn street from the west, and by a curve turns into Dearborn street on the east side of the latter street and proceeds north. Appellee and her husband were riding in a buggy on the east side of Dearborn street, east of the car track, March 27, 1896, about five o'clock in the afternoon, when the accident occurred. The horse and buggy belonged to appellee, and her husband was driving. A train of appellant, consisting of a grip-car and trailer, came up behind them and the front part of the grip-car collided with the left front wheel of the buggy, breaking the wheel, and the preponderance of

evidence is that the buggy sank on the left side next the car, and that appellee, who was sitting on the left side of the buggy, fell, or was thrown against the grip-car. The question of fact mainly contested between the parties is whether the accident was occasioned by the negligent driving of appellee's husband or by the negligence of those in charge of appellant's train. On this question the evidence is conflicting. O'Connell, a witness for appellee, testified:

"I am sergeant of police at the eleventh precinct station of the city of Chicago. March 27, 1896, I was stationed at the corner of Monroe and Dearborn streets in Chicago. It was about five o'clock in the afternoon, and I stood on the north crossing. There is a curve there, and the North Chicago street cars run from Monroe around to Dearborn street. I always kept the cars back until the car ahead was gone. There is a single track there for the cable cars. There is another track there for horse cars running to the Dearborn station. The cable comes from the west on Monroe and turns north on Dearborn. Plaintiff's husband drove down Dearborn street to my crossing, and I stopped them there over the crossing until the car got loaded up with people ahead of them, and went along, and then I beckoned them to come on. There was a row of wagons standing between the sidewalk and the street-car track, so that the outer wheel of the buggy had to go on one of the street-car tracks. I stepped one side, and the buggy went right along, and the street car that was coming along came right after them and ran into the wheel of their buggy. When I saw the grip-car coming I told the grip-man to stop until he gave a chance for those people to get out of the way. He didn't stop. They had gone about twenty feet when the car struck them. They went right by me on the crossing, and the grip-car came right around after that and ran into the buggy."

This witness also testified that he stood twelve or fourteen feet north of the north line of Monroe street, and that the buggy, when struck, was twenty to thirty feet north of where he stood. The preponderance of the evidence is that the outer or west wheels of the buggy were not in the car tracks, as testified by O'Connell, also that the left front wheel of the buggy, and not the left hind wheel, as he tes-

tified, was struck, but he might easily have been mistaken in these particulars.

Orvis, appellee's witness, testified:

" What first called my attention to the accident, was the cable car starting to come around the corner, and the grip-man was evidently ringing the bell very hard. I turned and noticed a policeman holding up his club, and the motor-man continued to come on. Opposite the place where I stood was the plaintiff and a gentleman. They were in a single rig, a covered carriage, and they were just starting up the horse as the grip-man came around, and the nearer he come the more they tried to get the horse out of the way. The policeman held up his club menacingly, but the grip-man did not stop. He held up his club to the grip-man, and there was a double rig, I believe a wagon, that stood partially crosswise of the street between the curb and where the car came round, and it blocked up the road partially, and there was not room between that wagon and the grip-car for the rig of Mrs. Smadraff to go through."

Appellee testified:

" There were carriages stopped by the side, outside the stores there, and on the end of three or four carriages was a big freighthouse wagon, so we couldn't go any place, except we got out on the track or up on top of the carriage."

Fred Smadraff, appellee's husband, testified:

" I went ahead to escape the car, but carriages and big delivery wagons were on my right side, so I couldn't go very much ahead, and I couldn't move to the right; so I drove as far ahead as I could, and then the car gave me no time."

Four of the witnesses for appellant testified that there was a wagon standing between the car track and the east curbstone of Dearborn street. Vaugn, appellant's witness, testified:

" He seemed to be trying to drive diagonally across the street, in order to get out of this wagon's way, that was stopping there, before the car got to him, but he could not get by, and he drew his horse around and got a little too far, and the footboard of the car struck the back part of the front wheel on the left hand side of the carriage."

This witness further testified:

"Where it was struck there was a wagon standing between the car track and the curb, and the horse and buggy started to go west of this wagon, and, as I understood it, the car was so close that he could not succeed, and he turned his horse east."

Murphy, appellant's gripman, testified that as he approached Dearborn street, he was signaled by the officer to come ahead, which he did; also, that as he approached the buggy, which was moving in a direction parallel with the car tracks, the driver of the horse turned him to the right, which cramped the left fore wheel, throwing it in the way of the car, and that this was the cause of the collision. Some five witnesses testified on behalf of appellant, that the horse was either turned to the right, or that he backed or was backed by the driver toward the car. The preponderance of the evidence is, as contended by appellant's counsel, that the car was running at a comparatively slow rate of speed when the collision occurred, and that it stopped within from two to five feet from the place of collision. The distance of the place of collision from the north line of Monroe street is stated by the gripman to be about sixty feet. The conductor fixes it at fifty to sixty feet, other witnesses fix the distance at fifty feet. The evidence shows that the position of the gripman was such that he could have seen plainly the buggy and such vehicles as were between the east car track and the east curb line of Dearborn street, and there is no claim that the car could not have been stopped after it rounded the curve, and before it reached the buggy. The credibility of the witnesses, and on which side was the preponderance of credible evidence, were questions for the jury, and we can not say that their finding that the collision occurred by reason of the defendant's negligence, is manifestly against the weight of the evidence.

Appellant's counsel asked the court to give the following instructions, which the court refused to give:

a. "The court instructs the jury that street cars have a right of way superior to that of all other persons at all places along their lines, except at street crossings, and that

at street crossings the rights of street cars and the traveling public are equal.    And if the jury believe, from the evidence, that the plaintiff was struck by one of the defendant's cars at some place along its line other than at a street crossing, then the court further instructs the jury that, in determining whether or not the said defendant was in the exercise of due care, you should take into consideration the fact that the said defendant had a right of way superior to that of all other persons, at all places along its line except at street crossings, together with all other facts and circumstances in evidence."

*b.*    " The court instructs the jury that if they believe from the evidence that the plaintiff was suddenly and unexpectedly placed in a position of danger, then, in order to charge the defendant with a duty to avoid injuring the plaintiff, the plaintiff must show, by a preponderance of the evidence, that the circumstances were such that the servant or servants of the defendant had an opportunity to become conscious of the facts giving rise to such duty, and a reasonable opportunity to perform it; and if the jury further believe from the evidence that the circumstances as shown by the evidence did not charge the said defendant with a duty as thus defined, or if the jury believe from the evidence that the defendant did not have a reasonable opportunity to perform such duty as thus defined, then they should find the defendant not guilty."

*c.*    " The court instructs the jury that no presumption of negligence arises against the defendant from the mere fact, of itself, that the plaintiff was injured in connection with defendant's car."

*d.*    " The jury are instructed that if they believe from the evidence that the person driving the horse and carriage in question, at the time and place in question, negligently drove against the car on the occasion in question, and that the injury to the plaintiff was caused solely thereby, then the plaintiff can not recover in this case, and you should find the defendant not guilty."

The preponderance of the evidence is, as before stated, that the buggy was not on appellant's track at the time of the collision, or at any time after the car turned on the curve into Dearborn street, and so appellant's counsel, in their argument, contend.    This being true, we can not perceive how appellant could have been prejudiced by the refusal of instruction *a.*    That instruction could only be important in respect to one driving on the track.

Instruction *b* is erroneous in the omission of an important element, viz., that the plaintiff might have been suddenly and unexpectedly placed in a position of danger by *the defendant's fault*, in which case the law would not be stated in the instruction.

Instruction *c* is substantially included in appellant's instruction 22, given, which is as follows:

" 22. The court instructs the jury that if they believe from the evidence that the injury to the plaintiff was the result of an accident which occurred without the negligence of the defendant as charged in the declaration, they should return a verdict of not guilty."

Instruction *d* is, in substance, included in appellant's third instruction given, which is as follows:

3. " If the jury believe from the evidence that the sole efficient cause of the injury to the plaintiff was the negligent manner in which the plaintiff's horse was driven at the time and place in question, if you believe from the evidence said horse was negligently driven, then you should find the defendant not guilty."

Lastly, appellant's counsel contend that the damages are excessive. When appellee was injured she was pregnant, and in about six weeks after the injury she gave birth to twins, two months before her time. She testified that they were born seven months from conception; that from the time of the accident till the birth of the twins she was sick; that she suffered pain, had hemorrhage of the womb, and could not rest, and that it was four months before she could get out of child-bed; that before the accident she was healthy and strong, and could do her own work and that of others, and earned $1.50 per day, and that since the accident she had been unable to work and has had constant pain in her left side and shoulders. One of the twins lived two years and the other about two years and two weeks.

Dr. William Evatt, a witness for plaintiff, testified as follows:

" I am a physician and surgeon, and have been practicing medicine in Chicago fourteen years. I am a graduate of Trinity College, Dublin. I attended Mrs. Smadraff, the

plaintiff, when her twins were born, and have attended her for about ten or twelve years. I was called in after the accident. I found her in bed and she was flowing profusely from the womb. She had intermittent pains, appeared to be about the fifth month in pregnancy, and seemed to be threatened with miscarriage. I examined her abdomen and body. I found the left side bruised from the ribs down to the hips, the abdomen pretty badly bruised, black and blue. She was suffering from nervous shock and suffering intense pain. I was obliged to give her medicine to stop the flow and relieve the pain; gave her liniments to rub on these bruised parts. She suffered intense pain on the ribs here on the left side. She was unable to breath—some symptoms of pleurisy from direct injury. This lasted about six weeks, off and on, during which time she lost, as I should judge, about two quarts of blood. She finally gave birth to these twins about the middle of May, 1896. These children were in the seventh month, very small, partially developed. One of them was bruised on the head, black and blue. It took me nearly an hour to restore life to it. That child had a curvature of the spine."

This witness further testified that appellee never fully recovered her health after the birth of the twins.

We would not feel warranted by the evidence in reversing the judgment on the ground that the damages are excessive.

The judgment will be affirmed.